GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY v. T. J. PATILLO.

Decided March 20, 1907.

**1.—Verdict—Evidence.**

Where there is any evidence reasonably tending to establish the facts necessarily involved in a jury's finding, the verdict should not be set aside by an Appellate Court.

**2.—Passenger Thrown from Train—Negligence—Evidence.**

In a suit by a passenger for personal injuries caused by being thrown from a rapidly moving train, while passing from coach to coach, evidence considered, and held sufficient to support a verdict against the defendant on the ground that its track was out of repair and plaintiff's fall was caused thereby.

**3.—Speed of Train—Negligence—Question of Fact.**

Whether or not the speed of a train under a given state of facts, is negligence, is ordinarily a question of fact to be determined by the jury.

**4.—Passenger—Passing from Car to Car.**

There is no rule of law forbidding passengers on a moving train from passing from one car to another, and whether or not a passenger is negligent in doing so is a question of fact for the jury.

**5.—Same—Assumed Risk.**

The risk a passenger assumes in going from one car to another of a rapidly moving train does not include a risk arising from the carrier's negligence, unless the negligence and its consequent danger be known.

**6.—Negligent Acts—Concurrence—Cause of Action.**

It is only when it appears from plaintiff's pleading that it takes the concurrence of a number of acts to constitute his cause of action that all need be proved to authorize a recovery.

**7.—Carrier of Passenger—Degree of Care.**

The high degree of care required of carriers of passengers extends to passengers moving from one car to another as well as to passengers in the coaches.

Appeal from the Fifty-seventh District Court, Bexar County. Tried below before the Hon. A. W. Seeligson.

*Baker, Botts, Parker & Garwood, Newton & Ward* and *W. B. Teagarden,* for appellant.—The undisputed facts showing that appellee, while a passenger upon appellant's train, and while the train was in motion around a curve, in the night time, when it was dark, under-

took to pass from one coach into another, voluntarily and without any reason for so doing, when one of the cars over which he passed was vestibuled and the other not, and was thrown from the train by the motion ordinarily incident to a swiftly moving train around a curve; that in so doing, under said circumstances, he assumed all risk of danger to himself, and by reason thereof, as a matter of law, he was not entitled to recover. The court below therefore erred in not granting appellant's motion for a new trial. Houston & T. C. Ry. v. Clemmons, 55 Texas, 89; Sickles v. Missouri, K. & T. Ry., 13 Texas Civ. App., 437; Choate v. San Antonio & A. P. Ry., 90 Texas, 82; 2 Shearman & Redfield on Neg., sec. 524, and notes; Dougherty v. Yazoo & M. V. Ry., 36 Am. and Eng. Ry. Cas. (N. S.), 327; Bemiss v. New Orleans C. & L. Ry., 47 La. Ann., 1671; s. c., 18 So. Rep., 711; McDaniel v. Highland, A. & B. Ry., 90 Ala., 64; s. c., 8 So. Rep., 41; McIntyre v. New York Cent. Ry. Co., 37 N. Y., 287; Coleman v. Second Ave. Ry. Co., 114 N. Y., 612; Goodwin v. Boston & Maine Ry., 84 Me., 203; s. c. 52 Am. & Eng. Ry. C., 380; Worthington v. Central Vt. Ry., 52 Am. & Eng. Ry. C., 384.

*H. C. Carter* and *Perry J. Lewis,* for appellee.

NEILL, ASSOCIATE JUSTICE.—This appeal is from a judgment of $6,000 (the verdict was for $9,000, but a remittitur of $3,000 was required and entered in the court below), recovered by appellee for personal injuries inflicted by the negligence of the appellant.

In his petition, the plaintiff sets forth the grounds of negligence as follows: "That heretofore, on or about July 2, 1900, plaintiff was a passenger on one of defendant's passenger trains, traveling from the city of El Paso, in El Paso County, Texas, to the city of Houston in Harris County, Texas, and when said train had reached a point about a mile and one-half east of the passenger depot in the city of San Antonio, on its way to Houston, and while plaintiff was passing from one car to another, the said train was operated in such a negligent manner that it gave a great and sudden and violent lurch and jolt of such force and violence that plaintiff was thrown from the said car to the ground, and sustained serious, painful and permanent injuries, as hereinbefore stated.

"Plaintiff avers that at the time he was thrown from the said car, the said train was still within the limits of the city of San Antonio, and it was being run and operated by defendant's servants and employes at a great and excessive rate of speed of about thirty miles per hour, and when said train was on or near a curve in the track, by reason of the great and excessive speed at which it was running, and by reason of the condition of the track, and the manner the train was being operated, it gave a great and sudden lurch and jolt, and with great force and violence threw plaintiff from the platform of the car to the ground below, causing him to sustain serious and permanent injuries.

"Plaintiff further avers that defendant's track, at the point where plaintiff was thrown from the train, was being repaired, and was left in a rough, incomplete and uneven condition while said repairs were going on, and this, together with the great, excessive and negligent

rate of speed, and the negligent manner in which the train was being propelled at that particular place, caused the said train to lurch and jolt with great suddenness and violence, and it threw plaintiff off the platform of said car. That plaintiff was at the time passing from one car to another, and was in the exercise of due care for his own safety, and the said injuries were wholly and directly caused by the aforesaid gross negligence and carelessness of the defendant, its servants and employes."

The defendant, after interposing a general demurrer, special exception and a general denial, answered: That if plaintiff was injured in the manner charged, his injury was due to his own negligence, and to risks and dangers voluntarily assumed by him, in that he, with knowledge of the existing conditions, attending dangers and in disregard of his own safety, voluntarily and without necessity therefor, attempted to pass from one car to another while the train was in motion, encumbered with a bundle without holding to handholds and other objects at hand, and that such dangerous act together with such carelessness and the careless manner in which he walked and acted caused him to fall; and that through one or all of such acts and omissions on his part, his injuries, if any were sustained.

The first, second and third assignments of error complain that the court erred in not granting a new trial because the verdict is contrary to the law and the evidence, in that it conclusively appears that plaintiff's injuries were caused by a risk assumed by him, by his contributory negligence, and that defendant was guilty of no negligence proximately causing them. The fifth assignment of error complains of the court's refusal to give defendant's first special charge, the effect of which was that the evidence showed no negligence on defendant's part in regard to the speed of the train; and the sixth, complains of the court's not giving its second requested special charge, which, in effect, is that it appears from the undisputed evidence that defendant's track at the place of the accident was at the time it occurred, in good condition and was not caused by any defect in it.

As all these assignments require us to review and consider the evidence, and to enunciate the principles of law applicable to it, they will be considered together, and the conclusions we shall deduce will be our findings of fact.

The testimony is uncontroverted that on the night of July the 2d, 1900, the plaintiff, while a passenger on one of appellant's train, in attempting to pass from one car to another while the train was in motion, fell to the ground and sustained physical injuries. The accident occurred about ten o'clock at night when it was very dark a short time after the train left the passenger station at San Antonio going east.

The other facts may be best shown by the testimony. The plaintiff himself testified that, in returning from the teacher's convention at El Paso, he was riding in a tourist sleeper next the rear car of the train, which was a Pullman coach; that the car he was in was vestibuled and the other was not; that there were several young lady teachers, who were also passengers on the train returning from the El Paso convention, riding in the Pullman whom he visited in the car several times en route between El Paso and San Antonio; that when the train

arrived and stopped in the last named city he went from this car into the one where the young ladies were and inquired if he could assist them in getting supper or refreshments, when they told him that they had brought a lunch and requested him to share it with them; that in the time which ensued one of the ladies expressed regret that she had not procured a little souvenir· cane, and that he, having a bunch of them, proffered to give her one; that when the train started out of San Antonio and the door of the coach was unlocked he went into his car for the purpose of getting his bunch of canes and returning to the Pullman, that the lady might select from the bunch one° for herself. It was in his endeavor to return with the canes that he fell or was thrown from the train. He describes the occurrence of the accident as follows: "I suppose by the time I started back the train had gone two or three miles, maybe. As I came back I had my canes in my hand and was holding the railing like I always do in passing—I got to my car, and just at the end of my car there was a jerk or lurch of some kind that threw me off my feet and broke my handhold and lurched me forward, threw me forward, and I struck my head against the door casing—something like that, and it knocked me unconscious. I was just reaching the end of my car and just facing to step over into the next car, onto the next platform, and this lurch or jerk came, and broke my handhold and just plunged me forward like that (illustrating) and knocked me senseless. That is all I knew until I picked myself up on the ground sometime afterwards. I was holding on with great care, because there was no moonshine, it was a dark night, and I stepped out, and the minute I stepped out I caught the rail and held onto it until I brought myself up to it, and was ready to make the next step, holding on with the right hand °as well as I remember—I naturally had the canes in my left hand—and holding on to that, I was just ready to make this step across on the next platform, to be sure of myself, and just as I was ready to step this jerk came, and the lurch broke my hand loose and plunged me against the car. This wound (indicating a scar on his forehead) shows for itself, which has healed. The last I know I was holding on with this hand (right), and I was just ready to step from my car, my car was the vestibule, and I knew the next car was not a vestibule, and I was holding here (illustrating) and was just ready to step one step, and then one step into the door, and then there was a terrific lunge of some kind, and it jerked me and threw me against the door casing, or something, and I struck it with my head, and that is all I remember until I picked myself up off the ground. I had been on trains before, and had gone from one car to another, as a stranger will in a new country, going through different places. It must have been no ordinary lunge, because it jerked me loose." His testimony throughout is perfectly consistent with the above narration of how the accident occurred. It is not thought necessary to relate in plaintiff's language his testimony as to the nature and extent of his wounds. It is deemed sufficient to say that they were such as authorized damages for the amount adjudged.

No one else witnessed plaintiff's fall. The first person who saw him after the accident was W. B. Klein, who testified that he lived along-

side of the G. H. & S. A. track on June 2, 1900; that on the evening of that day he remarked the train going east was from one hour to an hour and a half late; that, it being summer time, he had a cot in his yard and was playing with his dog, when, about three-quarters of an hour after the train passed, the dog commenced to growl and bark, which was something unusual; that he walked over towards the track to find out the reason for such action of the dog, and while going he heard someone shouting, or rather making a feeble attempt to shout, so he went in the direction of the voice and found plaintiff sitting alongside of the railroad track, seemingly much excited, who told him that he fell off the train; that I picked him up, and putting my arms around him for support my left hand became wet and taking him home I discovered by the light of the lamp that my hand was bloody; that he complained of pain in his left arm and upon investigation I found that his arm was broken and he was also cut in the face above the eyes. That he went to appellant's repair track where there was a telephone and notified the watchman of the facts and he telephoned to the chief dispatcher; that it was then twelve o'clock at night by the office clock, that in reply to the telephone message he was informed that an engine and caboose would be sent out for the wounded man and he was requested to show them where he was; that he waited perhaps an hour and the train came with Conductor Williams in charge; that the train stopped at his house and they took the man over to the caboose and carried him to the Santa Rosa Hospital. That witness then went to bed, got up next morning about five o'clock and went to look for the man's hat; that he went in an easterly direction and it must have been a mile from his house when a dog with him scented blood and that a few steps further he found a bunch of Mexican curio canes, and lower down found plaintiff's hat; that the place where he found the canes and hat was about six feet higher than the surrounding country and about two or more telegraph poles from a signboard with the figures "208" upon it; that at this place there was an earthen embankment alongside of the grade where they set off the handcars and that between the signboard with figures on it and the place where the handcars were set off, is where plaintiff must have fallen off the train as shown by the broken and crushed weeds he saw there, as if some heavy object had fallen upon them, and it was there he found the hat and canes, which he carried to plaintiff at the Santa Rosa Hospital, about eleven o'clock that day; that they then were preparing to perform an operation on plaintiff, that plaintiff then told him to look around in the same locality for his eye glasses which he had lost; that after going home he went to the same place on the railroad where the accident occurred and found a lot of men raising the roadbed and that upon inquiring of the foreman in charge if any of his men had found a pair of spectacles, he was told by him that one of them had found them that morning, and he called a Mexican up who handed him a pair of broken eye glasses; that the place where this occurred is on down-grade and at a curve coming out of a cut and is generally where they increased the speed of the train, and that he knew this by having heard the exhaust of the engines during his residence for a number of years in that locality. That the place where the accident occurred was

near the last curve of the railroad track leaving San Antonio going east near the edge of the city limits; that the section gang had been working on the track at this place weeks before and after the accident occurred, and that he knew this from personal observation.

Mr. Barnett, a brakeman on the train, who was a witness for defendant, testified that there was no unusual jar or movement of the train as it passed any of the curves when it was pulling out of San Antonio, nor at the curve east of San Antonio; that the train was moving along slowly without jerking or jarring and it was up hill and the train could not have made a jerk of any consequence as it was a heavy train of thirteen cars; that he was acquainted with the track and knew the curves and tangents for the first five miles out of San Antonio. That they were moving the train very slowly when they were pulling out of San Antonio, and that there was no unusual jerk or movement of the train while it passed the first curve out of San Antonio and up to the time it reached the Salado, and that he could and would have noticed any unusual jerk or jar in the movement of the train while riding in the coach and if there had been he would have remembered it at the time; that the usual speed of passenger trains at a point from three to five miles east of San Antonio is between eighteen and twenty-five miles an hour going east, but that he did not think that on the night of the accident it was running quite as fast as trains usually do.

The young lady, to whom plaintiff wished to present the souvenir cane, testified that she thought plaintiff left the Pullman car almost as soon as the train pulled out of San Antonio, but that she could not be accurate as to the distance the car had traveled at the time plaintiff left the car; that she did not notice any jar or lurch after plaintiff left the car to go to his own car; that she remembered the train was traveling pretty fast at the time; that she took no particular notice of the speed of the train, except to note that it was going quite rapidly, but no faster than usual between stations on the road.

J. D. Reed, the conductor of the train testified that in going out of San Antonio for the first four or five miles he was taking up tickets on the train and observed no sudden jerk or lurch sufficient to throw a man off his feet—no unusual jerk of the train whatever between the east yard and the Salado bridge, and if there had been a jerk or swaying of the train or anything of the kind he would have been apt to notice it; that this train was running naturally up grade out of the east yard and there was no occasion for any jerking, but if it had jerked he would have noticed it; that as he was standing, an unusual movement of the train would have been more perceptible to him because it would have unbalanced him. That it was up grade until around the first curve and crossing Government Hill and then down grade; that he could not say exactly the speed of the train that night, but it could not have been very great—not beyond twenty-five miles an hour before it passed beyond the curve, but as it neared the Salado bridge it would increase very much—maybe forty or fifty miles an hour at the time of reaching the bridge.

The testimony of A. S. Williams, the engineer of the train, and of several passengers was substantially, as to the speed and in regard to

there being no jerk or sudden movement of the train, as that of the conductor. But Williams stated that the maximum of steam would be used until the train reached the curve and no more could be put on, until they crossed the bridge, and that there was no way to jerk it with the engine.

Antonio Aviles, a witness for defendant testified that on July the 2d, 1900, he was working on defendant's road as a section hand at the curves just west of the Salado bridge; that there were approximately fifty or sixty men working there; that they were engaged in raising the track of the railroad and placing ballast under and around the ties; that they commenced the work on the east end of the curve and worked east towards the bridge crossing the Salado; that he did not know exactly how high the rails were raised nor how many inches of ballast were placed on the track, but that he thought about one-half an inch; that they would raise the rails and ties from a one-half inch to an inch and not more than the length of one rail at a time; that he could not give the difference in the height between that of the raised track and that which was not raised as that was a matter the foreman kept notice of, but that he knew that where the rails joined they were on a level with the one just raised; that he did not know the exact length of time they were engaged in raising the track, but thinks it was about three or four weeks; that on the morning of July the 3d, 1900, when he went to work he found a part of a pair of broken spectacles alongside the track, that it was on the right hand or south side going east; that he was working at the place where he found the spectacles at the time.

T. J. Lyne, the foreman of the section gang which was at work at or about the place when the accident occurred, testified that he commenced work with the gang a little piece beyond the east yards, "just doing a little work along in places mostly—well"; that at the first cut he shaped up the bottom of it a little so it would drain, and threw out a little dirt where there was any wash in it, lined up the ballast and if there happened to be any grass on it cut that out, and wherever there happened to be any dump washed by the rain he fixed that, and any little thing there was to do along the track; that his recollection is that he commenced the work about the last of June and had been there about three or four days when the accident occurred and that he had fifty or sixty men in the gang at work there, and that at times they would be a little short and sometimes a few more; and that the track was good for any speed, in good shape and as good as any track to be found anywhere in the country, way above the average track; that there were no low joints in the track, that it was all right; that he did not raise the track any for it didn't need raising because it hadn't been over three years previous to that time he had ballasted the track; that he would occasionally put in a tie where there was a bad tie, and would put in a rail, and where a tie needed little spacing he would space it or any little thing like that; that when he quit work on the night of July the 2d he left no uneven places and that where the men found the spectacles was two telegraph poles east of the point where he had quit work the evening before; that the track was allright, and in first class shape where the Mexican picked up the glasses and there were no

low joints at any point that would cause a passenger train to lurch going around that curve.

The testimony shows that the inner curve of the track was on its right hand or south side and all of the circumstances show conclusively that the plaintiff fell on the south side of the track.

This we believe to be as full a statement of the testimony as is necessary to be made, and that it fairly discloses the evidence upon which the verdict was rendered and upon which either party to the suit relies on this appeal.

We shall consider the assignments of error referred to, relating to the foregoing testimony, in the inverse order from which they appear in appellant's brief, and taking them up in this order the questions arising from them may be stated thus:

1. Does the undisputed evidence show that the railway track at the time and place of the occurrence of the accident was in good condition and that plaintiff's fall from the car was not caused by a defective condition of the track?

2. Does the evidence show no negligence on defendant's part in regard to the speed of the train?

3. Does it conclusively appear from the evidence that plaintiff's injuries were caused by his contributory negligence?

4. Does it conclusively appear from the evidence that plaintiff's injuries were due to risks and dangers known and voluntarily assumed by him?

The answers we shall give to these questions will constitute our conclusions of fact. In deducing the conclusions, the testimony will be viewed in the light most favorable to the verdict. For if there was any evidence reasonably tending to establish the facts necessarily involved in the jury's finding its verdict should be upheld; for primarily, under our system of judicature, such matters of fact are for its determination, and if there is any evidence to support the verdict, unless it be so manifestly against its preponderance as to show prejudice or .wrongful motive, it will be our duty to so construe it as to give effect to the findings of the jury manifested by its verdict.

1. There is no questioning the fact that the evidence conclusively shows that plaintiff fell from the front platform of the rear car in defendant's train on the night of July 2, 1900. What caused his fall is the question. This must be determined from all the facts and attending circumstances that can be reasonably deduced from the evidence. He was in the prime of manhood in full possession of his mental faculties and physical strength. Just before his fall he was cautiously holding to the handhold or railing of the car preparatory to stepping onto the platform of the one in front of him, when, according to his testimony, which is not disputed, but is corroborated by physical facts, he was thrown off his feet, his handhold broken and plunged forward against the door casing of the other car by a jerk or lurch which he says was terrific. That he was thrown forward is evidenced by the wound on his forehead and his broken eyeglasses, and that it was with great force is shown by his having been knocked senseless. Now, what caused this "terrific lunge" of the car? The undisputed evidence shows that it was not from the equipment or coupling appliances of

the cars or from the manner of operating the train or engine. It must, then, have been from some defect in the track, if it occurred at all. Is there any evidence or circumstances tending to show such a defect in the track as would have caused it? From the testimony of Aviles, the witness who picked up the broken spectacles, it appears that on July the 2d, 1900, the defendant had a force of about sixty men at work raising the track and placing ballast under and around the ties at the curve about where the accident occurred, that they were working from San Antonio east, and would raise the rails and ties from a half to an inch. It is true that the foreman of the gang testified they were not ballasting the track, but the jury might well have believed that the defendant would not have had a force of fifty or sixty men pottering and piddling about its track doing as near nothing, according to his testimony, for a week or more, as that number of men possibly could do. The jury might well have believed that when a railroad company has sixty men employed at work about its road that it has work for sixty men to do and that it will see that they do it, and if it so believed, it may have concluded that the men were ballasting the track as testified to by Aviles. If the track was being ballasted and raised a half inch to an inch, it would be that much higher where the work was done than where it had not been. The work was progressing eastward, and where it stopped on the evening of the day of the accident would be the point of contact between the rails that had been raised and those that had not been. At this point the end of the east rail would be lower than the end of the west one, and the wheels of the cars in passing over them would drop from the higher to the lower, which would naturally cause a jar, the force of which would be greatest near the front end of the car because nearest its wheels, the tendency of which would be to throw one standing on its front platform forward with a force in ratio to the speed of the train—the greater the speed the greater would be the tendency of the force to throw one forward. This discloses the only theory by which the lurch or jerk which broke plaintiff's handhold, threw him off his feet and against the door-facing of the car in front, can be accounted for, and is, in our opinion, consistent with the facts.

But on the other hand, it may be contended that there was no drop of the carwheels from higher to lower rails, because both the foreman of the gang and Aviles, himself, testified that the track was in good condition at the place of accident, the rails even and no low joints, and that, therefore, the accident could not have been caused by a defect in the railroad track. According to the foreman's testimony his gang had worked on July the 2d along the track a distance east of about two telegraph poles from where the evidence shows that plaintiff must have fallen from the train, and had left the track along where the work was done in good condition. This, if true, would show that there was no work for the gang to do next morning at or near the place where the accident happened, and that the work was commenced at least the distance of two telegraph poles east of there. This, however, is inconsistent with the testimony of Aviles that he found the plaintiff's broken spectacles when at work on the railway track on the morning of the 3d of July. The place where he found the glasses was, in relation to the

road, the same where Klein found plaintiff's hat and canes, which is evidently where plaintiff fell from the train. That they were working at this place, as testified to by Aviles, is corroborated by the evidence of Klein, who says he went to the same place where the accident occurred at about eleven o'clock on July the 3d and found a lot of men *raising* the *roadbed,* and the Mexican (Aviles) handed him the pair of broken eyeglasses, which he found that morning when he went to work. Therefore, the jury was not without reason for disbelieving the statement of the foreman that his men commenced work on the 3d of July two telegraph poles distant from where the accident occurred, and for believing that the work was begun that morning about where plaintiff fell from the train; and, from the nature of the work being done, was, in connection with the evidence of the lurch which threw plaintiff forward, warranted in concluding that the ends of the west rails were higher than the ends of the east rails at the point on defendant's road where the accident occurred. That the trainmen and other passengers did not observe the lurch of the train, may be accounted for by their not being in a position to have the evidence impressed upon them as it was on the plaintiff. We, therefore, conclude that the undisputed evidence does not show that the railway track at the time and place of the occurrence of the accident was in good condition, and that plaintiff's fall from the cars was not caused by a defective condition of the track; but, on the contrary, we conclude just the reverse.

2. Nor can we say that the evidence shows no negligence on defendant's part in regard to the speed of the train. It is shown that the train was behind time and had two hours to make up between San Antonio and Houston; to make up this lost time would require greater speed than was customary; according to the testimony of the young lady it was "traveling pretty fast" at the time plaintiff started from the Pullman to his car for the canes—"quite rapidly, but no faster than usual between stations." It was then just leaving a station and running through a city; the engineer, in order to show there could have been no jerk or lurch in the train, testified that he had on all the steam the engine could bear and that no more steam could be put on to cause a sudden jerk of the cars. From the time plaintiff was going from and returning to the rear car the train had gone the distance of nearly two miles. The force that took plaintiff off his feet, broke his handhold and hurled him against the door-facing of the Pullman car, which tends to show the speed of the train was great. Other evidence, though there is testimony to the contrary, tends strongly to the same conclusion. Whether this rapid speed of the train was negligence in the defendant, depends upon the attending facts and circumstances, as well as relation of the party to the railway company complaining of it as negligence, and is, ordinarily, a question to be determined by the jury in view of such facts and circumstances and relation sustained by the parties to each other. The facts that the train was running through a large city over a track that a large force of hands had been employed during the day in ballasting; that the plaintiff was a passenger upon defendant's train, to whom it owed the high degree of cars due by a common carrier, and had the right (under certain limi-

tations, as will be shown) to go from one car to another, were matters to be considered by the jury in determining the question. And the jury, with evidence of such facts, having found that defendant was negligent in running its train at such speed, we are without authority to disturb the verdict in that regard.

3. Contributory negligence, like all special pleas setting up new matter, is a defense, the burden of proving which, is, ordinarily, upon the defendant, and unless the evidence conclusively establishes such defense it must be left to the jury to say whether it has been proved. There is no rule of law forbidding passengers on a train to move from one car to another, so long as they act prudently in doing so. And the mere fact that an injury would not have been suffered, had the passenger remained in his car is not proof of contributory negligence, even though the train was in motion when such move or attempted move was made, if consistent with the ordinary prudence of a prudent man. The only question is, whether, under all the circumstances, the act was one natural to a prudent man, exercising his prudence. (2 Shear. & Redf'l Neg., sec. 524; Sickles v. Missouri, K. & T. Ry. Co., 13 Texas Civ. Apps., 437; Choate v. San Antonio & A. P. Ry. Co., 90 Texas, 82; Chesapeake & O. Ry. Co. v. Clowes, 93 Va., 189, 24 S. E. Rep., 833; Costikyan v. Rome, W. & O. R. R. Co., 12 N. Y. Supp., 683; Cotchett v. Savannah, etc., Ry. Co., 84 Ga., 687, 11 S. E. Rep., 553.) Some of the cases cited show that slight reasons have been held sufficient to justify a passenger in going from one car to another without rendering him guilty of contributory negligence. So it is seen that the question of whether the plaintiff was guilty of contributory negligence in attempting to pass from his car to the one behind it, is one of fact for the jury to determine in the light of all the facts and attending circumstances. The evidence shows that his reason for going from the one car to the other was for the purpose of paying a courtesy, such as is due from a gentleman to a lady, more obligatory upon a gentleman than going into another car for the purpose of getting a drink of water, smoking a cigar or warming his feet. The evidence tends strongly to show that he exercised the care for his safety of a man of ordinary prudence, and discloses no act, nor circumstance, nor combination of facts and circumstances such as would justify a court in withholding the question from the jury and in pronouncing him guilty of contributory negligence as a matter of law. We, therefore, find in accordance with the verdict, that the plaintiff was guilty of no negligence proximately contributing to his injuries.

4. We can not agree with appellant in its contention that the evidence conclusively shows that plaintiff's injuries were caused by dangers known and voluntarily assumed by him. The principle of assumed risk, in its application to a passenger, is but the expression of a corollary to the rule that the care and circumspection required of a common carrier to his passenger is the utmost care which can be exercised under all the circumstances, short of a warranty of the safety of the passenger; or, as otherwise expressed, the duty of the carrier is to provide for the safety of his passengers "so far as human foresight will go." Whatever risks there may be extending beyond this duty are assumed by the passenger; and are the casualties which hu-

man sagacity can not forsee, and against which the utmost prudence can not guard. (Hutch. Car. (3d ed.), sec. 900.) The logical sequence of this principle is that an injury to a passenger, not coming within this principle of assumed risk, must be attributable to either the negligence of the carrier or the negligence of the passenger. The risks one assumes in going from one car to another of a rapidly moving train, merely for his own convenience, does not include a risk arising from the carrier's negligence. (Chesapeake & O. Ry. v. Clowes, supra; Stewart v. Boston & P. R. Co., 146 Mass., 605, 16 N. E. Rep., 466.) If, however, it can be said in any case that a passenger assumed the risk of the common carrier's negligence, it must appear that he had knowledge of such negligence and of its consequent danger, either when he became a passenger or encountered the risk. And, strictly speaking, his subjecting himself to a known danger arising from the carrier's negligence would be an act of contributory negligence, rather than the assumption of a risk. Now, the evidence in this case tends strongly to show that had there been no negligence on the part of the defendant, no risk would have been encountered by the plaintiff in passing from one car to another, though the train was in motion and rounding a curve. Therefore, as he had no knowledge of and never assumed the risk of the defendant's negligence, of which it has been shown by our preceding findings to have been guilty, and as he had the right to go from one car to the other, we have concluded that instead of the evidence conclusively showing that his injuries were caused by a risk assumed by him, it fully appears, whatever may have been the cause, they were not the result of any risk assumed by him.

The fourth assignment of error complains of the second paragraph of the court's charge which is as follows: "If you believe from the evidence that on or about the 2d day of July, 1900, the plaintiff, while a passenger on one of defendant's trains, attempted to pass from one car to another; and if you further believe from the evidence that while so attempting to pass from one car to another, through defendant's negligence, as alleged in plaintiff's petition, the cars were suddenly and violently lurched and jolted, as alleged in plaintiff's petition, and that by reason of such lurch or jolt, if any there was, the plaintiff was thrown down and from the train, and injured, as alleged in his petition; and if you further believe from the evidence that such lurch and jolt, if any, were negligence, and that such lurch and jolt, if any, were caused by the defendant's negligence, as alleged in plaintiff's petition; and you further find that the plaintiff was not guilty of any negligence, then I charge you that your verdict must be for the plaintiff." The objection urged is that it is misleading and confusing to the jury, in that in order for plaintiff to recover, it was necessary for him to prove the entire combination of acts constituting the alleged negligence of defendant, because, as pleaded, no single act of negligence would justify a recovery. Whereas the charge authorized a verdict for plaintiff if the jury found any one or more of the alleged acts of negligence were proved. And besides, if the charge did not expressly authorize a verdict on such proof, it, by referring to plaintiff's petition for the acts of negligence averred, was susceptible of such interpretation.

We do not interpret plaintiff's petition as alleging a series of negli-

gent acts so intimately blended as to require proof of them all before a verdict could be returned in his favor. The acts of negligence averred are severable, and are such that proof of one or more of them would authorize a recovery, if shown the proximate cause of plaintiff's injury. It is only when it takes a concurrence of a number of acts to constitute a cause of action, that all need be proved to authorize a verdict for the plaintiff. If the appellant desired the court to state in its charge the several acts of negligence alleged by the plaintiff, it should have prepared and submitted to the court a special charge to that end.

What we have said in disposing of the preceding assignments, and the authorities cited in support of our holding, demonstrate that the court did not err in refusing to instruct the jury at appellant's request that the rule requiring a common carrier of passengers, in the maintenance of its track, and in the operation of its trains, to exercise that high degree of care which a very skillful and prudent person engaged in the same business would exercise, is applicable only when the passengers are riding inside of the coaches, and not to a passenger when he attempts to pass of his own volition from one car to another while the train is in motion, and that he assumes all the risks and dangers of defective track and of the operation of the train that may exist, in spite of such rule, and that if he is injured in consequence of such extra risks and dangers he can not recover.

While there are cases in which it is held that if a train is in rapid motion and the passenger voluntarily and without a necessity or the direction of the conductor or other officer having authority, attempts to pass from one car to another, his conduct will be such negligence as will debar him from the right of recovery for an injury which would not have happened to him had he remained in his place (Dougherty v. Yazoo & M. V. Ry., 84 Miss., 502, 36 So. Rep., 699; McDaniel v. Highland, A. & B. Ry., 90 Ala., 64, 8 So. Rep., 41; Bemiss v. New Orleans, C. & L. Ry., 47 La. Ann., 1671, 18 So. Rep., 771), they are not in accord with the law if it is to be deduced from the great weight of authority, or from sound elementary principles. In jurisdictions other than where the decisions just cited were rendered, it is almost universally held that a passenger under such circumstances does not take upon himself the risk of an accident arising from the negligence of the railway company. This disposes of appellant's seventh assignment of error, and of the eighth as well.

We do not think the judgment is excessive, as is complained by the ninth assignment of error.

There is no error in the judgment and it is affirmed.

*Affirmed.*

Writ of error refused.